## FOSTER v. MURPHY & CO.

### (Circuit Court of Appeals, Second Circuit. February 3, 1905.)

1. BROKERS—MARGINS—CONTRACTS—MODIFICATION.

   In an action for breach of a broker's contract by the sale of cotton for nondeposit of margins, evidence *held* to sustain a finding that the previous contract between the parties had been modified so as to authorize the immediate sale of plaintiff's cotton, without notice, on his failure to keep his margins good.

2. SAME—AUTHORITY OF AGENT—PROOF.

   Where a witness, who was a member of defendant firm, testified that he called on plaintiff, and told him defendant was dissatisfied with the business, and wanted a distinct understanding, and thereupon the contract between the parties was modified, such proof was sufficient to show that the witness had authority to act for defendants.

3. SAME—CONSTRUCTION.

   Where a contract between broker and customer with reference to margin transactions authorized the broker to close the transactions when the margin was exhausted, he was not required to wait until a loss had occurred, but was entitled to sell when the margin was depleted or impaired.

4. SAME—CALLS FOR MARGIN—REASONABLENESS.

   Defendants, during market excitement, called plaintiff for margins by telegram at 10:10 a. m., and at 10:43 sent another telegram that, if margins were not deposited, plaintiff's account would be closed at once. Plaintiff admitted receiving a telegram worded "somewhat similar," and at 11:03, prior to which a tremendous. crash in the market increased the shortage in plaintiff's margins from $1,800 to over $8,000, defendants telegraphed that unless plaintiff made a deposit within five minutes they would close the account, which they subsequently did. *Held*, that such facts warranted a finding that plaintiff was given a reasonable time within which to deposit margins.

**5.** Same—Evidence.

Where plaintiff had been permitted to state everything that was said by him or defendants' agent at the time a contract between plaintiff and defendants was alleged to have been modified, and to restate the same in rebuttal, it was not error for the court to refuse to permit plaintiff to answer whether any new contract was made between plaintiff and such agent.

**6.** Same.

In an action by plaintiff, who had been doing a private wire commission business through defendants, against defendants to recover for the alleged wrongful sale of cotton for plaintiff's failure to put up margins, evidence as to what quotations a witness saw registered on plaintiff's blackboard on the day of the sale, as distinguished from the quotations actually sent or received from defendants over plaintiff's wire, was inadmissible.

**7.** Same—Verdict—Motion to Vacate—Appeal.

Exceptions to a refusal to set aside the verdict present no question reviewable in the Circuit Court of Appeals.

In Error to the Circuit Court of the United States for the Southern District of New York.

T. Henry Dewey and John T. Abney, for plaintiff in error.
William H. Stayton, for defendant in error.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. The plaintiff, at the time in controversy, was a citizen of South Carolina and was a stock, grain and cotton broker, doing business at Greenville in that state. The defendant was a New York corporation engaged in the same business at the city of New York. The defendant owned a private telegraph wire connecting its office with the office of the plaintiff which it rented for $41.67 per month to the plaintiff. By means of this wire the market prices in New York, of the commodities dealt in, were communicated to the plaintiff and the figures were immediately posted on a board kept in his office for the use of his customers. The plaintiff agreed to send all buying and selling orders to the defendant and secure them by the stipulated margins; the margin for cotton being agreed on at $1 per bale. The relation of broker and customer was thus established. Prior to the 9th of February, 1900, the defendant had purchased for the plaintiff 9,600 bales of cotton which were being held and carried for his account. On that day the fluctuations in the cotton market were violent and rapid and, after calling for additional margins which were not sent, the defendant sold all of this cotton at private sale and without notice to the plaintiff. The sale was promptly repudiated by the plaintiff and this suit was thereafter commenced to recover damages for the conversion.

The questions in controversy were principally questions of fact, the plaintiff contending that the sale was made in direct violation of the agreement between the parties; the defendant that it was in exact accord with its stipulations. The cause was tried with great care and attention to detail by the trial judge and, in order to avoid any confusion or injustice which might result from a general verdict, he took the precaution to frame and send to the jury specific questions covering every aspect of the controversy upon the facts. These questions and

the answers returned were as follows: "First: Did the contract between the parties provide that, in the event of a selling out, defendant should be relieved from giving notice of time and place of sale?" The jury answered this question "Yes." "Second: Did the contract between the parties provide that, in the event of a selling out, defendant might sell at public or private sale?" The answer was "Yes." "Third: Did the defendant give plaintiff reasonable notice of demand for additional margin, and of their intention to sell him out if he failed to respond to or make his margin good?" The answer was "Yes." "Fourth: Did J. F. Gatins send the telegram to R. C. Foster, saying: 'All right. Deposit $3,100 and figure account, and if find that we are in the wrong will not call for any more. You have 9,500 bales long. J. F. G.'" The answer was "No." We thus have a contract relating to marginal transactions established between the broker and its customer by which, in consideration of lower commissions and other special advantages growing out of the exclusive use of a private wire, the common-law rule governing that relation was modified by permitting the broker to sell the property at public or private sale without notice of the time and place of the sale in case the customer, after reasonable notice, failed to keep his margin good. The jury also found that the plaintiff had reasonable notice of the demand for additional margin and of the defendant's intention to sell his property if he failed to respond. They found, further, that the alleged telegram, which in effect proposed to accept $3,100 as a conditional compliance with the demand for margin, was never sent by the defendant. Unless there was error in submitting these questions to the jury there can be no doubt that the cause was properly disposed of. The answers settled the entire controversy between the parties and the subsequent action of the court in directing a verdict was simply giving force and effect to the findings of the jury.

It is argued that there was no evidence of a special agreement modifying the original agreement between the parties. We are unable to accede to this view. It appears that the parties had been doing business for some time prior to August or September, 1899, and that the manner in which it had been conducted was not satisfactory to the defendant. In these circumstances an agent of the defendant, clothed with full power to negotiate, visited the plaintiff at his office in Greenville and made definite arrangements with him as to the conduct of the business in the future. The following is his testimony on the subject of margins:

"Q. Was anything said with reference to maintaining this margin? A. Yes, to be kept good at all times. Q. Was anything said with respect to the rights of Murphy & Co., or Foster, upon failure to keep the margin good? A. Yes, sir. Q. What was said? A. It was said that we could sell him out instantly if his margin became exhausted. Q. With or without notice? A. Without notice."

The plaintiff does not deny this conversation so far as it relates to margins; he says only that he does not recollect it, he does say, however, that the subject of selling at public or private sale was not mentioned. The most favorable view of the conversation which the plaintiff could expect was that it presented a question of fact to be passed

on by the jury. Manifestly the trial court could not say as a matter of law that there was no evidence of a special agreement when the testimony that such an agreement was made was not even contradicted.

But it is urged that the defendant's agent was unauthorized to act in the premises and that the plaintiff had no reason to suppose that he had authority so to act. The testimony of Phelan, the agent, sufficiently answers this contention. He says:

"I told him in the first place why I had come to see him, that we were dissatisfied with the business and that I wanted to have a distinct understanding and agreement with him about it. Q. Did you say who 'we' were? A. Murphy & Co., yes. I was one of them."

Again it is insisted that the agreement testified to by Phelan gave the right to sell the property only in the event that the margin was completely exhausted. This construction of the agreement cannot be maintained. A margin is intended for the protection of the broker, but if he be compelled to postpone the sale of the property which he is carrying for the customer until he has no margin left it is difficult to perceive upon what theory any adequate protection is afforded. In other words he must wait until he has actually incurred a loss before he can act. The plaintiff's construction of the agreement, is based, we think, upon a forced, narrow and unwarranted interpretation of the word "exhausted." The parties were both brokers entirely familiar with the technical terms and usages of the business. Phelan had sought the plaintiff to secure a more favorable agreement than the law gave him and it is inconceivable that after requiring that the margins should be "kept good at all times" he should agree that the plaintiff might violate the agreement with impunity, leaving the defendant remediless. That he intended to use the word "exhausted" in the sense of "depleted" or "impaired" is too plain to admit of doubt.

The amount necessary to margin the deals in question was about $10,000. Any sum less than this was insufficient security and if the plaintiff failed to keep the margin at this amount after due notice the defendant had the right to sell him out. This was the agreement which the parties made and which the law implied. In effect the jury so found, they could not have answered the third question quoted above upon any other hypothesis.

It is argued by the plaintiff that the court assumed "that there was some special agreement subsequently made modifying the original agreement and that this assumption was error." We do not pause to inquire whether the point is presented by the assignments of error for the reason that we think the plaintiff misapprehends the position of the trial judge, he assumed nothing that was not admitted or proved by uncontradicted testimony. That plaintiff and Phelan had a conversation was conceded: whether the conversation modified the original agreement in the particulars in controversy was not conceded, and, therefore, the jury was asked to pass upon the question in all its details.

The proposition that the plaintiff was not given a reasonable time in which to furnish the margin called for and that the court should have so declared as matter of law, is based upon the erroneous assumption that he was allowed but five minutes. As we have seen the jury found

that he was given reasonable time and their verdict is amply supported by the testimony. The telegram to which the plaintiff undoubtedly refers was sent at 3 minutes past 11 and is as follows: "Unless you give us deposit in five minutes, will close your account." This was the last of a series of telegrams, the first being sent at 10:10 a. m., all making urgent demands for margin. As early as 10:43 a. m. the defendant sent a dispatch saying: "If you do not deposit your account will be closed at once." The plaintiff admits that he received a dispatch worded "somewhat similar." How it can be seriously contended that the plaintiff received a notice of five minutes only in the face of this telegraphic correspondence occupying nearly an hour, it is difficult to perceive.

Again it is contended that in no event was the defendant warranted in selling out the entire property. It is argued that, as the margin became impaired, only sufficient cotton should have been sold to make good the existing deficiency. The contract between the parties did not require such action by the defendant and in any event it is not apparent that it was practicable to adopt such a course on the morning in question. It was a period of intense excitement. The course of the market shows that no serious difficulty was to be apprehended until 10:47, when there came a tremendous crash which in 15 minutes increased the shortage in the plaintiff's margin from $1,800 to over $8,000. After this unexpected and abnormal drop in the market there was no time or opportunity for nice calculations as to whether all or a part of the cotton should be sold. The margin was rapidly diminishing—it seemed but a question of a few moments when the last dollar would disappear and it was clearly within the defendant's rights to sell the entire property and save what was possible from the wreck. It is evident from the correspondence that the defendant hoped and expected that the plaintiff would make the necessary deposit and that extreme measures would not be necessary. The unexpected drop in the market so changed the situation that the defendant was justified in taking prompt action for its protection. The account between the parties shows that the margin had become so small at the time the sale was ordered that common prudence compelled the defendant to act.

The calculations of the court based upon the time of the sale and the ruling prices at that hour were most carefully made and the direction of a verdict in favor of the plaintiff for $315 was all the plaintiff had a right to expect. This amount was reached by holding the defendant to the strictest accountability in making a private instead of a public sale, and, after the jury had answered the questions in favor of the defendant a verdict for a larger sum could not have been logically directed.

There was no error in sustaining the objection to the question propounded to the plaintiff "whether any new contract was made between you and Phelan after Phelan came." The court allowed the plaintiff great latitude in stating everything that was said by him or Phelan. The above question was asked after the court had permitted the plaintiff in rebuttal to restate the conversation with Phelan. After having exhausted himself as to what was said it was clearly incompetent for him to characterize the testimony. Whether a new contract was made was a question for the jury and not for the plaintiff to answer.

There was no error in sustaining the objections to the questions asked of the witness King as to what quotations he saw registered on the blackboard in the plaintiff's office on February 9th. In the absence of proof to show that the posting was correct and that all quotations received were posted, the testimony was inadmissible, and, in any event, it was immaterial. The important fact to be ascertained was not what was posted, but what was actually sent and actually received. Upon this question the evidence was very full and complete.

Other propositions are argued which do not seem to be embraced in the pleadings or presented by the assignments of error. Exceptions to a refusal to set aside the verdict present no question reviewable in this court. Morning Journal v. Rutherford, 51 Fed. 513, 2 C. C. A. 354, 16 L. R. A. 803. It suffices to say that we have examined the record with care and find therein no error which warrants a reversal of the judgment.

The judgment is affirmed.